UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PETER VROOM,

                    Plaintiff,

        v.

AMERIQUEST TRANSPORTATION
SERVICES and BROWN
NATIONALEASE,

                    Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 11-3897
            (JEI/KMW)

**OPINION**

**APPEARANCES:**

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Mark A. Rosen, Esq.
1300 Mount Kemble Avenue
PO Box 2075
Morristown, NJ 07962
        Counsel for Plaintiff

DILWORTH PAXSON LLP
Erin Galbally, Esq.
James J. Rodgers, Esq.
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
        Counsel for Defendants

**IRENAS**, Senior District Judge:

        This tortious interference suit comes before the Court on

Plaintiff's motion for reconsideration (Dkt. No. 67).[1]  Plaintiff

challenges several factual assertions and legal conclusions

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C.
§ 1332.

1

contained in the Court's January 23, 2014 opinion and order, in which the Court granted Defendants' motion for summary judgment. See Vroom v. Ameriquest Transp. Serv., Civ. No. 11-3897, 2014 WL 252489 (D.N.J. Jan. 23, 2014). For the reasons detailed below, Plaintiff's motion will be denied.

## I.

While the facts underlying the parties' dispute were previously reported, see Vroom, 2014 WL 252489, at *1-2 (D.N.J. Jan. 23, 2014), an overview is necessary for resolution of Plaintiff's motion. Such an overview indicates that although Defendants sought Plaintiff's firing, their conduct did not transgress generally accepted standards of morality, and thus was not unlawful.

From November 2001 until July 2009, Plaintiff was employed as President and Chief Executive Officer of the Truck Renting and Leasing Association ("TRALA"), a national nonprofit trade association. TRALA is composed of truck renting and leasing companies located throughout North America, and derives its revenue from membership dues and advertising receipts from member conferences.

Defendant Ameriquest Transportation Services ("AMQST") provides fleet management services to independent truck companies. It was a member of TRALA until December 2006, at

2

which time it acquired NationaLease Purchasing Corporation ("NPC").[2]  NPC is a for-profit corporation that purchases equipment for the members of National Truck Leasing Association ("NTLA" or "NationaLease").  NTLA is a nonprofit trade association composed of independent truck lessors operating throughout North America.  (Vroom Aff. ¶ 3)  NTLA members purchase truck parts and supplies from NPC, use the "NationaLease" trademark in advertising, and receive roadside assistance from fellow member companies.

Pursuant to the purchase agreement, AMQST obtained operational control of NTLA.[3]  Although AMQST ceased to be a TRALA member after the acquisition, NTLA, and many of NTLA's independent members, continued to be TRALA members.

Beginning in late 2006, Defendant Douglas Clark was Chief Executive Officer of AMQST.  After the company's acquisition of NPC, Clark also became CEO of NTLA.  Although AMQST resigned from TRALA in 2006, Clark, in his capacity as NTLA's CEO, held a

---

[2] AMQST purchased the ownership shares in NPC for cash and AMQST stock.  (Opp'n Br. to Summ. J. at 4)  Sellers of NTLA shares were also given the opportunity to purchaser additional AMQST stock.  (Id.)
    AMQST acquired NPC, in part, to control access to NPC's multimillion dollar truck equipment purchasing program.  The acquisition increased AMQST's influence within the truck and truck equipment markets. (Opp'n Br. to Summ. J. at 4)

[3] NPC and NTLA do not have any formal corporate relationship, although "most of the NTLA member companies were shareholders of NPC."  (Opp'n Br. to Summ. J. at 4)

seat on TRALA's Board of Directors until March 12, 2009.  At

that time, at TRALA counsel's recommendation, Clark was not re-

nominated.[4]  (Opp'n Br. to Summ. J. at 3)

Defendant Brown NationaLease ("BNL") is an independent

truck leasing company.  BNL was a member of TRALA until June 30,

2009, when it resigned along with NTLA.  (Opp'n Br. to Summ. J.

at 3)  BNL was, and continues to be, a member of NTLA.

Defendant Thomas Brown was President of BNL.  He was also a

member of TRALA's Board of Directors until March 10, 2009.

Defendant William Ford was an AMQST Director.  He

previously served as President and CEO of NTLA, and formerly sat

on TRALA's Board of Directors as Chairman.  (Vroom Aff. ¶ 16)

Plaintiff argued in opposition to Defendants' motion for

summary judgment, and again in support of his motion for

reconsideration, that Defendants sought to promote the interests

of AMQST by having NTLA compete with TRALA.  Specifically,

Plaintiff alleges AMQST began scheduling meetings during

previously scheduled TRALA conferences to divert "financial

support TRALA received from industry suppliers in the form of

dues, sponsorships, and event registrations."[5]  (Opp'n Br. to

---

[4] Later in 2009, NTLA and BNL rejoined TRALA, and Clark returned
to TRALA's Board.  (Opp'n Br. to Summ. J. at 3)

[5] Vroom also began receiving reports from industry suppliers that
AMQST was pressuring them to transfer their financial support
from TRALA to NTLA and/or AMQST.  (Vroom Aff. ¶ 28)

4

Summ. J. at 6; Vroom Aff. ¶¶ 22-26)  Plaintiff believed the competition rendered Defendants Clark and Brown, both Directors of TRALA and, simultaneously, executives of NTLA, with conflicts of interest.  (Vroom Aff. ¶¶ 31-32)

Vroom articulated his position, and advocated for a change in leadership in NTLA, during a conference in February 2009 in Orlando, Florida.  (Defs.' Stmts ¶ 26)  Vroom, Brown, and several NTLA representatives attended.  Vroom's concerns and suggestion for a change were quickly rebuffed.  (Defs.' Stmts. ¶ 30)  Vroom subsequently launched into an expletive-laden tirade, for which he apologized over e-mail the following day.[6]  (Defs.' Stmts ¶¶ 32-33)

Following the conference, both parties sought to convene a meeting with TRALA's Board of Directors.  Vroom wanted to either oust Clark and Brown from TRALA leadership or have them withdraw from their leadership positions with NTLA.  NTLA sought to bring about Vroom's dismissal.[7]  (Opp'n Br. to Summ. J. at 7-8)

---

[6] Specifically, Vroom apologized for "losing [his] cool," "[i]t was unprofessional" and he regretted "let[ting] [his] emotions on the issue take control."  (Defs.' Stmts ¶ 34)

[7] As evidence of NTLA's attempt at removal, Vroom points to the fact that NTLS emailed all TRALA Board members except Vroom about setting up a meeting, and that AMQST CEO Clark asked several staff members to call NTLS members and convince them to resign from TRALA.  (Riha Aff. ¶¶ 29-30)

On March 5, 2009, NTLA circulated a memorandum notifying its members that the NTLA Board of Directors had voted to resign from TRALA effective March 31, 2009.  (Defs.' Stmts ¶ 38)  The memorandum did not reference Vroom, although it did state the resignation was due to a "controversy" the parties were unable to rectify.[8]  (Id.)

On March 9, 2009, TRALA's counsel responded to the memorandum in a widely circulated letter addressed to Defendant Clark and nonparty Gene Scoggins, President of NTLA.  The "purpose of th[e] letter [wa]s to formally bring the[] [conflict of interest] concerns to [their] attention" and highlight the fact that TRALA "remain[s] very concerned about the impact on TRALA of past conduct and interference and potential future conduct and interference by certain AMQST/NTLS representatives." (Opp'n Br. to Summ. J., Ex. 47)

The letter continued to allege that Defendant Ford, an AMQST Board member, "recently contacted numerous TRALA Executive Committee members" "stat[ing] that he was calling on behalf of

---

[8] The memorandum also stated that "TRALA's Board of Directors was refusing to grant NTLA a meeting to address its concerns and stating that it was left with no choice but to disassociate from TRALA."  (Opp'n Br. to Summ. J. at 7)  Vroom argues that a meeting was not scheduled because "TRALA's by-laws required that a written agenda be produced in order to schedule an Executive Committee meeting" and "defendants never produced such a written agenda[.]"  (Id.)

the interests of AMQST/NTLS" and that "AMQST/NTLS will seek to request the removal of [Vroom]" at the upcoming TRALA meeting. (Opp'n Br. to Summ. J., Ex. 47 at 2)   The letter concluded with a warning:

> [W]e wish to caution both NTL[A] and AMQST that any interference with TRALA's meeting will not be tolerated. Further, any defamatory statements or wrongful conduct that threaten to interfere with TRALA's meeting, and/or its employment relationship with its President/CEO, will be considered a serious matter, and treated accordingly. I trust that you will advise your respective representatives accordingly, and that any issues in this regard will be avoided.

(Id. at 3)

Days after the letter, during a NationaLease Open Session meeting attended by NTLA members and industry vendors, Defendant Brown recounted Vroom's February 2009 tirade.   (Opp'n Br. to Summ. J., Ex. 34 (Riha Aff. ¶ 12)).   According to the meeting's agenda, Brown was supposed to address the burgeoning conflict between NTLA and TRALA, (Id. ¶ 17); instead, he focused on the tirade, stating that during the conference he feared for his life and believed Plaintiff was a "maniac" who was "mentally unstable."   (Id. ¶ 19)

On March 25, 2009, representatives of NTLA met with TRALA's Board of Directors at the Dallas-Fort Worth Airport to address NTLA's membership.   (Defs.' Stmts ¶ 46)   During the meeting, representatives of NTLA, including Clark and Brown, "explained the concerns they had with Vroom's performance . . . [and]

explained that NTL[A] intended to resign from TRALA if it continued to employ Vroom."  (Vroom Aff. ¶ 52)

NTLA agreed to extend its membership on a monthly basis, but when Vroom's dismissal was not forthcoming, NTLA resigned from TRALA effective June 1, 2009.  (Defs.' Stmts ¶¶ 42, 43, 48)

Between June 15 and June 30, 2009, Clark and others associated with AMQST and NTLA asked staff members to call NTLA's members and urge them to resign from TRALA.  (Riha Aff. ¶ 29)  "The calls were made for the purpose of continuing to exert pressure on TRALA to terminate Vroom's employment."[9]  (Id. ¶ 31)

Vroom was terminated July 8, 2009.[10]  (Defs.' Stmts ¶ 51)  At the time, neither AMQST, NTLA, nor BNL were members of TRALA.  (Defs.' Stmts ¶ 51)

## II.

The purpose of a motion for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence."  Max's Seafood Café v. Quinteros, 176 F.3d 669, 677

---

[9] The calls were also placed to inform TRALA members that NTLA "planned to initiate its own advocacy program, which was TRALA's primary function for the industry."  (Riha Aff. ¶ 31)

[10] Vroom does not detail the circumstances of his termination. The only evidence is his unsigned affidavit in which he states: "[T]he decision to terminate my contract occurred on July 8, 2009, only a week after NTLA's resignation from TRALA actually became effective."  (Vroom Aff. ¶ 60)

(3d Cir. 1999).  A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice.  Lazaridis v. Wehmer, 591 F.3d 666, 667 (3d Cir. 2010); N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

### III.

Plaintiff raises two legal arguments supporting his motion for reconsideration: (A) the Court overlooked the fact that "[a]s a not-for-profit corporation, TRALA cannot compete with Defendants," (Br. at 5); and (B) "Plaintiff produced substantial evidence of wrongful and tortious conduct" and the Court was incorrect to rule otherwise.[11]  (Br. at 5-6)  Because Plaintiff fails to identify any conclusion of law the Court overlooked, let alone a manifest injustice that must be corrected, his motion will be denied.[12]

---

[11] Plaintiff also identifies two factual inaccuracies contained in the Court's previous recitation of the factual background. (See Br. at 2-5)  Plaintiff's corrections are immaterial and have been incorporated into Section I, supra.

[12] To prevail on a claim for tortious interference with an existing contractual relationship, a plaintiff must prove: (1) an existing contractual relationship; (2) defendants' knowledge of both the existing contractual relationship and plaintiff's reasonable expectation of economic benefit; (3) intentional

## A.

With regard to Plaintiff's first argument, Plaintiff

writes:

> TRALA is a not-for-profit trade association.  It cannot
> and does not compete with large for-profit corporations
> such as the defendants.  The defendants' actions were
> not in the nature of competition but were designed to
> silence Vroom.  Vroom was acting at all times with the
> support and consent of TRALA's leadership in fulfilling
> his fiduciary responsibilities to the Association and
> compliance with federal law governing the legal
> operation of tax exempt non-profits.

(Br. at 5)

The Court has difficulty understanding Plaintiff's

contention.  If it is Plaintiff's position that Defendants'

conduct was unlawful because they sought to compete with a non-

profit, Plaintiff fails to bring to the Court's attention any

legal authority establishing why such competition is

prohibited.[13]  If the unlawfulness lies in the goal of silencing

Vroom, Plaintiff fails to articulate why Vroom's speech is

---

interference; (4) the malicious nature of the intentional
interference; and (5) actual damages resulting from the
interference.  <u>Printing Mart-Morristown v. Sharp Electronics
Corp.</u>, 563 A.2d 31, 37 (1989).  The parties agree that there is
no "discernable material difference" between the laws of New
Jersey and Virginia and that New Jersey law should apply.
(Summ. J. Br.at 18, n. 79; Opp'n Br. to Summ. J. at 10, n. 2)

[13] Plaintiff argues that case law involving tortious interference
claims made by and against for-profit corporations is
inapposite.  (Br. at 5)  Yet Plaintiff fails to support his
claim of inapplicability, and does not put forward any case law
he deems relevant and supportive of his claims.

protected.  And if the unlawfulness lies in the disparity in influence between AMQST and TRALA, Plaintiff again puts forward no authority prohibiting such conduct.

Regardless of the exact contention Plaintiff sought to advance, all three interpretations fail to identify a point of law overlooked by the Court.  Consequently, Plaintiff's first argument fails to justify reconsideration.

**B.**

Plaintiff's second argument amounts to a simple disagreement with the Court.  Plaintiff writes: "The Court's decision found that [P]laintiff failed to adduce evidence of unlawful or wrongful conduct by [] [D]efendants.  Plaintiff respectfully submits that he did produce substantial evidence of wrongful conduct including evidence of per se defamation engaged in by AMQST and BNL."  (Br. at 6)

But for Plaintiff's allegation of "per se defamation," addressed further below, Plaintiff simply articulates his disagreement with the Court's previous decision.  Such arguments are routinely rejected.  See, e.g., Natalizzo v. Astrue, Civ. No. 12-2490, 2013 WL 1903344, at *2 (D.N.J. May 7, 2013) ("Plaintiff's Motion is denied because he merely disagrees with the Court's previous decision and has not shown a need to prevent manifest injustice."); D'Allessandro v. Nunn, Civ. No.

11

01-5713, 2006 WL 166503, at *2 (D.N.J. Jan. 23, 2006)

("Petitioner merely disagrees with this Court's Opinion. . . .

Therefore, his motion for reconsideration will be denied."),

Consequently, Plaintiff's argument here is unconvincing.

The one aspect of Plaintiff's argument that renders it more

than a simple recitation of his disagreement with the Court is

the fact that he, for the first time, alleges Defendant Brown is

liable for defamation, and that his theory of liability for

tortious interference rests on a finding of defamation.  (See

Br. at 6-8)  The Court finds two reasons why Plaintiff's

argument fails.

First, Plaintiff does not raise a claim for defamation in

his Amended Complaint, nor state anywhere in his opposition

brief to Defendants' motion for summary judgment that his theory

of liability rests on a claim for defamation.  (See Opp'n Br. to

Summ. J. at 10-14)[14]  Furthermore, Plaintiff's only evidence of

---

[14] Plaintiff does allege in his Amended Complaint that Defendant
Brown "made factually baseless and false statements about"
Plaintiff, "calling into question his integrity and business
character, with the purpose to cause TRALA to end his
employment."  (Am. Compl. ¶ 11) But see Resolution Trust Corp.
v. Dunamr Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("In opposing
a motion for summary judgment, a party may not rely on his
pleadings to avoid judgment against him. . . . [T]he onus is
upon the parties to formulate arguments; grounds alleged in the
complaint but not relied upon on summary judgment are deemed
abandoned."); Freeman v. Middle Tp. Bd. of Educ., Civ. No. 10-
6024, 2012 WL 3715925, at *3 (D.N.J. Aug. 27, 2012) (following
and quoting Dunamr).

defamation lies in an affidavit produced for a different litigation that Plaintiff cites, for the very first time, in his motion for reconsideration.  (See Opp'n Br. to Summ. J., Ex. 34 (the Affidavit of Judy Riha submitted in the Circuit Court for the City of Alexandria in the matter of "Vroom vs. Thomas Thayer, et al."))  A motion for reconsideration, however, "is not a vehicle for a litigant to raise new arguments or present evidence that could have been raised prior to the initial judgment."  CPS MedManagement LLC v. Bergen Reg'l Medical Ctr., L.P., 940 F. Supp. 2d 141, 168 (D.N.J. 2013).  Consequently, Plaintiff cannot succeed on his motion for reconsideration by pursuing a theory of liability he did not propound in opposition to Defendants' motion for summary judgment.

Additionally, Plaintiff's argument is unconvincing because he fails to set forth a cognizable claim for defamation.

Plaintiff writes that "Defamation can constitute wrongful conduct to support a claim for tortious interference."  (Br. at 6)  And to the extent he implies that a claim for tortious interference may, under certain circumstances, be based upon defamatory statements, he is correct.  See Professional Recovery Serv., Inc. v. General Elec. Capital Corp., 642 F. Supp. 2d 391, 408 (D.N.J. June 16, 2009); LoBiondo v. Schwartz, 323 N.J. Super. 391, 417 (App. Div. 1999).  However, Plaintiff cannot pursue allegedly defamatory statements under the banner of

13

tortious interference to evade the strict requirements applied
to defamation.  <u>See, e.g.</u>, <u>Bainhauer v. Manoukian</u>, 215 N.J.
Super. 9, 36 (App. Div. 1987) (recognizing a special interest
privilege which "arises out of a legitimate and reasonable need,
in particular situations, for private people to be able freely
to express private concerns to a limited and correctively
concerned audience[.]").  Consequently, his failure to set forth
and satisfy the requirements for a claim of defamation preclude
survival of his claim for tortious interference.

## IV.

For the reasons stated above, Plaintiff's motion for
reconsideration will be denied.  An appropriate order
accompanies this opinion.

Date: June ___, 2014

Hon. Joseph E. Irenas
Senior United States District Judge

14